WILLIAM J. KING & SONS *vs.* THE QUIDNICK COMPANY.

A., dealing in cotton, brought *assumpsit* against B. upon a balance of account for cotton delivered, and upon a promissory note given by B. to A. for cotton furnished to B. No plea in set off was filed, but B. claimed a right to recoup his damages for the delivery of inferior cotton.

*Held*, that the question of recoupment was confined to the cotton covered by the account and the note.

*Held*, further, that the question of recoupment was not affected by the existence of the note.

*Held*, further, that in Rhode Island a warranty is not inferable from the price paid.

There being no evidence to show:

Either by what representations, bargain, grade, or sample any particular lot was sold; therefore, nothing to prove any warranty as to the subject of the suit;

Or that of poor cotton at B.'s mill any came from lots warranted by A., or did not correspond in quality to that bought from A. by B.; therefore, nothing to show that a warranty if given had been broken;

Or that any warranty or breach of warranty related to the cotton in suit:

*Held*, that the claim for recoupment could not be allowed.

In the state of evidence above given:

*Held*, that no fraudulent collusion of B.'s treasurer and purchasing agent with A. to receive poor cotton could be inferred from the facts shown.

*Held*, further, that no fraudulent collusion of B.'s treasurer with A. could be inferred from the fact that A. sold the cotton at a price above the market rates.

Dealing in "futures" defined.

DEFENDANT'S petition for a new trial.

*February* 24, 1883. STINESS, J. For several years the plaintiffs sold cotton to the defendant, and this suit is to recover a sum remaining due at the close of their dealings, represented by a promissory note for $386,000, and a balance on book account of $11,968.40.

The giving of the note and delivery of cotton as shown by the account were not disputed at the trial, but the defendant claimed: *first*, that there was a breach of an implied warranty of quality; and *second*, that there was a collusive and fraudulent agreement

between the plaintiffs and Chafee, the defendant's treasurer, who bought the cotton, that he should pay them more than its reasonable value and market price.

The court ruled that, upon the testimony, the jury could not allow either of these claims, and as all the questions raised in this petition are included and can best be considered under that comprehensive ruling, our simple inquiry will be whether such a ruling was erroneous in law or fact.

It appears that the sales were principally made by a member of the plaintiff firm, now deceased, in the defendant's office, upon a bargain for each line of cotton.

There is not a word in the report of the testimony tending to show that in these bargains any representations or inquiries were made as to the grade, description, quality, or fitness of the cotton. Written orders were given for the delivery of bales as required, but these did not show what grade was to be delivered, nor were there any bills describing it. The shipping clerk of the plaintiffs testified in cross examination that " they delivered cotton according to an understanding which they had with Mr. Chafee," but it does not appear anywhere in the testimony what that understanding was; much less that it was such an understanding as expressed or implied a warranty of quality. Mr. Chafee was a witness, but was not asked to state upon what terms the sales were made, so far as related to grade, quality, or description.

The only testimony which is claimed to bear upon the point is that of the shipping clerk, who, being asked what kind of cotton was delivered in a specified lot, replied : " It was cotton such as we sold to the Quidnick Company ; an average of low middling cotton ; " also that of Wm. J. King, one of the plaintiffs, who said : " We sold different grades at different times ; sometimes they ran from ' middling ' and ' low middling ' to ' ordinary.' Sometimes they were made upon samples. Sometimes they were made for average ' low middling ' cotton."

Now this does not show by what terms, description, or sample the cotton was sold ; the words are merely descriptive of different kinds of cotton delivered ; they do not tell us what the bargain was ; if the cotton was sold by sample the same words of description might be used. But let us suppose that these terms were

descriptive of the contract and not of the thing delivered, still the defendant did not seek to put in any testimony that cotton sold for " ordinary," " middling," &c., was not up to grade, or that any sold by sample was not up to the sample, but only that the cotton at the mill was not up to the grade of " low middling ; " thus assuming that all the cotton sold and delivered was to be of that grade.

The testimony does not sustain this assumption, and would not warrant a jury in so finding. The defendant further claims that as the plaintiffs knew the cotton was to be used in the manufacture of print cloths there was an implied warranty that it should be fit for such use.

This rule applies in cases where, for want of inspection, the purchaser relies on the vendor; it does not apply in cases where goods are sold by sample or upon the purchaser's inspection and judgment. Benjamin on Sales, § 661.

The defendant offers no evidence to show how the cotton was purchased, and therefore neither the court nor jury could apply the rule. We cannot look simply to the orders and infer a warranty from their lack of designation, for the testimony shows there was a bargain for each lot. The Quidnick Company may have had cotton that was poor and unfit for use, but if it was cotton selected by their agent from samples to which it corresponded, or upon his judgment, or by his direction, no warranty of quality would be implied. In such a case the company would have poor cotton because it had a poor buyer, but it would have to pay for what its agent bought nevertheless.

There was neither evidence nor offer to show that Chafee in any case relied on the plaintiffs in buying, or if he did that he did not then get a suitable article. But even assuming that the rule applied, the only offer or exclusion of evidence relating to the cotton covered by this suit was the question to the carder : " During the time you were there how did that cotton work ? " Objection was made and the question ruled out, but no exception was taken. Suppose, however, the question had been allowed, and the answer had been that it worked badly, or, as the witness had stated before, that they had had cotton so poor they could not use it, still the answer could not relate to all the cotton, for the witness said

" it averaged different qualities," and the jury, from anything in the case, could not have told whether the poor cotton came from lots ordered of the plaintiffs relying on their judgment, or selected by Chafee on his own judgment, or selected by the shipping clerk " according to the understanding which they had with Mr. Chafee ; " and, of course, they would not have been warranted in guessing at it.

The burden was on the defendant to show that the note and account should be reduced. To do this they must have shown that the merchandise delivered did not correspond to that expressly or impliedly contracted for. Showing that poor cotton was received was only one step in the proof, and an inconclusive one, for Chafee might have bought it, knowing it to be poor, because it was cheaper than good cotton ; it was equally essential to show in the next place that the poor cotton was in some way warranted to be of better quality. It is not enough to show that some was warranted and some was poor ; the two things must be connected so as to show that the poor was that which was warranted. We do not find in the record any testimony or offer to this point.

As we have already indicated, only the cotton sued for can be considered in this case. By this we mean that covered by the note as well as that in the account. As between the plaintiffs and defendant it is immaterial as a matter of law that a note had been given. The fact that the defendant had made a promise in writing to the plaintiffs to pay their account would no more preclude recoupment in a proper case than a verbal or implied promise to the same effect.

All lots prior to those covered by the note had been received, used up, and paid for. As compared with the latter they stand by themselves and are not connected with the ones in suit. The different lots were not parts of one continuing transaction, but formed distinct independent transactions, inasmuch as bargains were made for each lot. Consequently the contracts which preceded April, 1881, were not involved with those which followed, and proof of a breach of them would not be admissible in the present case, because recoupment only applies to damages arising out of the contract sued upon. The price of a horse, for instance, cannot be reduced by recoupment because the plaintiff broke his

warranty of a cow. Independent or completed contracts may sustain set off but not recoupment. No set off was pleaded, and only such damages therefore as arose from a breach of warranty of the cotton involved in the suit could in. any event have been considered by the jury.

The testimony of Sprague and Brastow as to quality related to cotton delivered before April, 1881, and was not relevant to the issue ; Hopkins did not say when he saw any of the King cotton, so that it did not appear that he saw any of that in suit ; but whenever it was, the point of his testimony was only that it was worth " less than low-middling." The only other witness as to quality was Card, who had worked for the defendant through all the years of their dealing with the plaintiffs, but neither the question put to him nor the testimony he gave pointed to the period of time covered by this suit ; it was general ; " How did the cotton work during the time you were there ? "

The defendant's counsel produced some samples of poor cotton which he said was taken from the last of this cotton in suit ; but Card, the only witness who was asked about them, said he never saw them before, and no further attempt was made to identify them.

We have thus seen that there was no testimony nor offer to show :

1. By what representations, bargain, grade, or sample any particular lot of cotton was sold ; therefore, nothing by which the jury could have determined whether there was a warranty or not, as to the subject of this suit ;

2. That of the poor cotton found at the mill, any came from lots that had been warranted, or did not correspond in quality to that which was bought ; therefore, nothing by which the jury could have determined whether a warranty, if made, had been broken ;

3. That any warranty or breach of warranty related to the cotton covered by the suit ; therefore, nothing by which the jury could have determined whether there should be recoupment.

Upon either of these grounds the ruling of the court that the jury could not allow the defendant's claim was correct.

The defendant's counsel claimed orally, though he does not

claim so in his brief, that a warranty is implied from a sound price. This is not the rule of the common law. It is recognized only in two States; in Louisiana where the civil law is followed, and in South Carolina to a restricted extent. 1 Parsons on Contracts, 584, note.

Was there a collusive and fraudulent agreement between the plaintiffs and Chafee, the defendant's agent, to defraud the company by an excessive price?

While it is true that "fraud is peculiarly a fact for the jury, and from its nature is susceptible only of circumstantial proof," nevertheless facts must be shown which will warrant the inference.

The facts from which it is claimed that fraud can be inferred are these :

1. That advantage was taken of Chafee's ignorance of the cotton business in that poorer cotton was put off upon him than that which he bought and paid for.

We have already seen that the record does not designate what kind of cotton was contracted for in any one of the several bargains, so as to afford means of comparison between what was bought and what was delivered. Counsel have assumed all through that it was all to be of the grade and description of "low-middling," but of this there is no proof.

2. The plaintiffs stated that because of the indefinite credit required by the defendant they charged throughout their dealings from one quarter to three quarters of a cent a pound more than they would have sold the same cotton for to a person of good credit or for cash ; that they did not sell for any particular price over and above the market but for whatever they could get, interest being charged from the date of delivery. In view of the fact that Chafee had in his hands, as trustee, a large amount of property, it was claimed by the defendant that such credit was unnecessary, and therefore the admitted fact of a regular charge above market rates was primâ facie evidence of collusion and wrong.

As the case stands before us we are not to consider the necessity for credit but to assume that there was none, leaving the bare fact that there was a charge above the market price. No other fact tending to show fraud is claimed; hence the question arises, could the jury from that fact infer fraud? We think not. Not only is

the presumption of law in favor of honesty and against fraud, but if the proposition is to be allowed that a price above the market is fraudulent, then any one who buys an article of merchandise and afterwards finds the same thing is cheaper in other stores, can rescind the sale for fraud. Such a doctrine would not only unsettle all business affairs, but is without foundation in law.

We think the matter was put correctly by the judge at the trial. " There is nothing here that tends to show any imposition on Mr. Chafee. The fact, if true, simply tends to show incompetence on his part to buy cotton, which is no defence to the Quidnick Company. If he was a poor buyer that is their fault. Mr. King had a right to sell them cotton for all he could get."

Another claim made orally by the defendant's counsel, not in the brief, is that the dealing between the plaintiffs and Chafee was illegal and wrong, because in some cases it was a dealing in "futures."

There was no evidence that such dealing related to any of the cotton covered by this suit, but occasionally lots were bought to be delivered as required. In all cases there was an actual sale and delivery, and this we think is quite sufficient to distinguish the transactions from those purely speculative and gambling operations which are pronounced illegal by the courts.

Contracts relating to merchandise to be delivered in the future are an essential element in business methods, and the fact that one may gain or lose by the fluctuations of market prices does not render them illegal. Indeed, the exercise of sound judgment and shrewd forecast in the probable rise and fall of prices, from demand and supply, competition, legislation, &c., is a marked feature of a good business man.

That there is a chance for one to gain or lose by such contracts does not make them any more illegal or immoral than the stocking of a store by a merchant with goods which he hopes to sell for a profit, but on which he may lose, shows that he is doing an unlawful and speculative business. A carpenter agrees to build a house for a fixed price; either party is liable to gain or lose by changes in the price of lumber and other materials. Manufacturers agree to supply goods to customers upon orders with a price fixed. Coal, produce, and all sorts of merchandise are sold in the same way.

This is not dealing in "futures" in the speculative use of the term ; it is legitimate and ordinary business.

The term has grown out of those purely speculative transactions, in which there is a nominal contract of sale for future delivery, but where in fact none is ever intended or executed. The nominal seller does not have or expect to have the stock or merchandise he purports to sell, nor does the nominal buyer expect to receive it or to pay the price. Instead of that a percentage or "margin" is paid, which is increased or diminished as the market rates go up or down and accounted for to the buyer. This is simple speculation and gambling ; mere wagering on prices within a given time. It is not buying and selling, and is illegal as against public policy. It is widely different from the class of transactions shown by this testimony.

We have heard that some modern social reformers assert that "interest is crime and rent is robbery." To allow the defendant's point would be to add to such doctrine that buying and selling in the hope of gain is gambling.

The jury would not have been warranted in finding for the defendant on the ground of fraud, and the ruling in this respect therefore was correct.

We have not confined our attention merely to the points raised in the record, for in view of the importance of the case we were unwilling to dispose of it on any narrow or technical grounds. On the contrary, we have considered the plain, broad question, whether upon any of the testimony given or offered the jury could, under the law, have allowed any part of the defendant's claim. For the reasons stated we think they could not.

It is therefore unnecessary to consider the exceptions relating to the effect to be given to the acceptance and use of the cotton, and also to the knowledge of the price and quality of the cotton by Sprague, the president of the Quidnick Company.

The petition for a new trial must be dismissed.

*Petition dismissed.*

*Benjamin F. Thurston, James M. Ripley & C. Frank Parkhurst,* for plaintiffs.

*Benjamin F. Butler & Andrew B. Patton,* for defendant.

NOTE. — The above case was heard by STINESS, TILLINGHAST, and CARPENTER, JJ.